IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO.  07-00268-02 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION TO SUPPRESS WIRETAP |
| vs. | ) | EVIDENCE |
| | ) | |
| JOHN EDUARDO AYALA,   (02) | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE

## I. INTRODUCTION

The United States intends to use evidence obtained as a result of four separate Wiretap Orders in the criminal prosecution of John Eduardo Ayala ("Defendant").  Defendant now moves to suppress all evidence obtained from the wiretap, claiming that the authorizing judicial officer erred in determining that the affidavits demonstrated the necessity requirement for the wiretaps.  After reviewing the Orders authorizing the wiretaps, the applications and affidavits presented in support of those Orders, the Motion to Suppress Wiretap Evidence and the United States' Opposition, and the arguments of counsel at the November 21, 2007 hearing, the court DENIES Defendant's Motion to Suppress.

## II. __BACKGROUND__

### A.    The Authorization and Objectives of the Wiretaps

Defendant's Motion to Suppress involves four separate Orders

Authorizing the Interception of Wire and Electronic Communications, all signed

by United States District Judge Susan Oki Mollway: 1) a December 11, 2006

Order Authorizing the Interception of Wire and Electronic Communications

relating to cellular telephone number (702) 358-8245 ("Telephone No. 1"); 2) a

January 10, 2007 Order Authorizing the First Renewal of Interception of Wire

Communications on Telephone No. 1 for an additional thirty days;[1] 3) a January 8,

2007 Order Authorizing the Interception of Wire Communications relating to

cellular telephone number (808) 779-4765 ("Telephone No. 2"); and 4) a January

25, 2007 Order[2] Authorizing the Interception of Wire and Electronic

Communications relating to cellular telephone number (808) 457-8705

("Telephone No. 4").[3]

---

[1] This Order also authorized the wiretap of telephone number (702) 237-5153, which the United States refers to as "Target Telephone 3." The United States represents that it will not offer evidence of any telephone calls intercepted over this line during trial.

[2] An Amended Order Authorizing the Interception of Wire Communications on this telephone was entered on February 5, 2007. It appears that the Amended Order was sought due to a typographical error contained in the caption of the January 25, 2007 Order.

[3] The court refers to this telephone as "Telephone No. 4" in this Order to maintain consistency with the United States' numbering system as referenced in the various affidavits.

In each of her Orders, Judge Mollway found probable cause that the named subjects and others had and were committing various federal offenses, including controlled substance offenses and money laundering.  Judge Mollway also found, in paragraph 4 of each Order, that "[i]t has been adequately established that normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried."

The objective of each wiretap was to determine the full scope and operations of a conspiracy to distribute drugs, and to gain sufficient admissible evidence to prosecute those involved.  Telephone No. 1's application states that the objectives were to reveal:

> (1) the nature, extent and methods of operation of the narcotics business of the target subjects, (2) the identities of the target subjects, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities, (3) the receipt and distribution of contraband and money involved in those activities, (4) the locations of contraband and of items used in furtherance of those activities, (5) the existence and locations of records, (6) the location and source of resources used to finance their illegal activities, and (7) the location and disposition of the proceeds from those activities.

Telephone No. 1 Application ¶ 9.  The other applications list objectives that are substantially identical.

Drug Enforcement Administration ("DEA") Agent William Wise's December 11, 2006 Affidavit in Support of Application for Order to Authorize

3

Wire and Electronic Interceptions on Telephone No. 1 sets forth similar

objectives:

> In particular, these wire and electronic communications are
> expected to concern the specifics of the above offenses,
> including: (i) the identities of source(s) of supply, customers,
> participants, aiders and abettors and other co-conspirators of
> the Interceptees in their illegal activities; (ii) site(s) for storage
> of illegal drugs; (iii) dates, times, places and schemes for
> buying, concealing, possessing, delivering, distributing, and
> paying for illegal drugs; (iv) the locations of items used in
> furtherance of the illegal activities, including weapons; (v) the
> existence and location of records, in particular drug ledgers,
> associated with this activity; (vi) the nature, extent, and
> methods of the criminal organization in which the Interceptees
> participate; (vii) the location and source of resources used to
> finance the illegal activities; and (viii) the subsequent
> concealment[,] distribution, and transfer of contraband and
> proceeds from these illegal activities.

DEA Agent Clement Sze's January 10, 2007 Affidavit in Support of

the Application for the First Renewal of the Interception of Wire Communications

on Telephone No. 1, DEA Agent Gary A. Byrd's January 5, 2007 Affidavit in

Support of the Application for an Order Authorizing the Interception of Wire

Communications on Telephone No. 2, and DEA Agent Byrd's January 25, 2007

Affidavit in Support of the Application for an Order Authorizing the Interception

of Wire Communications on Telephone No. 4 all set forth the following

objectives:

In particular, these wire communications are expected to concern the specifics of the above offenses, including: (i) the nature, extent, and methods of operation of the business of the violators and others yet unknown; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the distribution and transfer of the contraband and money involved in those activities; (iv) the existence and location of records; (v) the location and source of resources used to finance their illegal activities; (vi) the location and disposition of the proceeds from those activities; and (vii) the locations and items used in furtherance of those activities.

**B.      Telephone No. 1**

Agent Wise's December 11, 2006 Affidavit in Support of Application for Order to Authorize Wire and Electronic Interceptions on Telephone No. 1 sets forth the steps that the investigators took prior to seeking a court approved wiretap, and the inadequacy of normal investigative procedures.  Agent Wise's affidavit was incorporated by reference into the three later filed affidavits regarding Telephone No. 1, Telephone No. 2, and Telephone No. 4.  The following is a summary only, putting into context Defendant's contention that the United States failed to satisfy the necessity requirement.

### *1.      The Use of Confidential Informants*

At the time of the initial wiretap application for Telephone No. 1, the DEA had obtained significant information regarding Defendant's involvement in a conspiracy to distribute crystal methamphetamine.  Much of the information was

obtained from confidential sources and consensually recorded telephone conversations.  The affidavits describe in some detail how these sources were developed and the investigation's use of these sources of information.

Cooperating Source Number One ("CS-1"), having several prior arrests and convictions, cooperated with the DEA after a June 3, 2004 arrest for possession of crystal methamphetamine.  CS-1 admitted to purchasing crystal methamphetamine from Roxanne Bates, who claimed to obtain the drugs from Defendant, Wilsonis Ayala, and "BUDA."  CS-1 provided information that Bates aided the Ayala organization in recruiting couriers to transport drugs between Las Vegas, Nevada and Hawaii.  CS-1 claims that Bates requested CS-1 to courier the drugs.  Agent Wise's December 11, 2006 Affidavit in Support of Application for Order to Authorize Wire and Electronic Interceptions on Telephone No. 1 ¶¶ 19-23.

Cooperating Source Number Two ("CS-2"), having several prior arrests and a conviction, cooperated with the DEA after a March 2, 2005 arrest for possession of crystal methamphetamine.  CS-2 stated that CS-2 frequently accompanied Bates when she distributed drugs, and assisted by counting money from the transactions.  According to CS-2, Bates stated that Wilsonis Ayala supplied Bates with drugs for distribution.  *Id*. at ¶¶ 24-29.

6

CS-2 asserted that after Wilsonis Ayala's March, 2005 arrest,

Defendant and Jose Tito Ayala continued to traffic crystal methamphetamine for

the Ayala organization.  CS-2 identified individuals as members of the Ayala

organization and described various activities of these individuals, including their

involvement with the transportation of drugs and money.  *Id*. ¶¶ 30-32.

Cooperating Source Number Three ("CS-3"), having several prior

arrests and convictions, cooperated with the DEA after a July 21, 2005 arrest for

obstructing a criminal investigation and obstructing police (and was subsequently

charged in a federal indictment with obstruction of justice arising out of an attempt

to pay a witness to testify falsely).  According to CS-3, from January, 2005 to

March, 2005, CS-3 met with Wilsonis Ayala on an almost daily basis to obtain two

to three ounces of crystal methamphetamine.  Wilsonis Ayala told CS-3 that he

had approximately four partners who assisted in the distribution of drugs.

*Id*. ¶¶ 33-37.

Cooperating Source Number Four ("CS-4"), having several prior

arrests and convictions, cooperated with the DEA after a May 28, 2005 arrest for

possession of crystal methamphetamine.  CS-4 indicated that he has known

Defendant since approximately 1998 or 1999, and knew him to distribute crystal

methamphetamine.  *Id*. ¶¶ 39-42.

7

CS-4 claimed to have been present when, in 2002, John, Julio, and Wilsonis Ayala counted an estimated $1,000,000 that had been delivered to Las Vegas, Nevada from California in a U-Haul truck.  CS-4 also drove tow trucks that he believed contained money and/or drugs, collected money for Defendant, and purchased pound quantities of drugs from John and Wilsonis Ayala for distribution in Hawaii.  CS-4 also provided the names and roles of other members and customers of the Ayala organization.[4]  *Id*. ¶¶ 42-44.

Cooperating Source Number Five ("CS-5"), having several prior arrests and convictions, cooperated with the government after an April 14, 2006 arrest for possession with intent to distribute methamphetamine.  CS-5 told investigators that, beginning in 2004, CS-5 purchased crystal methamphetamine from Defendant.  Initially, CS-5 purchased one to two pounds of crystal methamphetamine from Defendant on approximately three separate occasions.  CS-5 later agreed to receive drug shipments from Defendant.  CS-5 estimated that he received four to five parcel shipments of fourteen to twenty pounds each of crystal methamphetamine.  The shipments were made via the United States Postal Service by sealing the drugs in tin cans using a canning machine.  CS-5 also

---

[4] On August 19, 2005, CS-4 also made a controlled delivery of $5,000 to Defendant as partial payment for approximately eight ounces of crystal methamphetamine that CS-4 reported he had received from Defendant.  *Id*. ¶¶ 76-82.

explained that he acted as a translator for Defendant and other members of the drug trafficking organization that did not speak English.  CS-5 also arranged a shipment of crystal methamphetamine with Nelson Gaitan-Ayala.  *Id*. ¶¶ 49-55.

Source of Information Number One ("SOI-1"), having several prior arrests and convictions, cooperated with the DEA after a December 9, 2005 arrest for possession with intent to distribute crystal methamphetamine.  According to SOI-1, Defendant sold SOI-1 approximately 17 pounds of crystal methamphetamine in May or June, 2005.  SOI-1 also described purchasing a canning machine for Defendant to use to conceal and ship drugs.  SOI-1 described receiving drugs from Defendant packaged in cans on at least three occasions.  *Id*. ¶¶ 59-62.

## 2.  *Information Gathered from Arrests*

The Wise affidavit also details the arrests of various individuals.  The information gathered from these arrests, consistent with information obtained through the confidential sources, indicated that Wilsonis Ayala and Roxanne Bates had recruited several couriers to carry crystal methamphetamine from Las Vegas, Nevada to Hawaii.  On March 2, 2005, the police arrested Raychel Cabral, Wilsonis Ayala, and Roxanne Bates.  Bates indicated that she distributed drugs in Hawaii and then paid Defendant through another party.  In a separate arrest, an

individual indicated that he had been fronted drugs by Defendant for resale.  *Id*. ¶¶ 63-70.

### 3.    *Search Warrants and Seizures*

A March, 2004 search warrant executed on Wilsonis Ayala's Honolulu residence yielded crystal methamphetamine and $49,100.  A search warrant executed on Jose Ayala's Honolulu residence on November 15, 2005 yielded a gun and crystal methamphetamine.  *Id*. ¶¶ 71, 86.

Agents also seized United States currency during the course of the investigation.  Among other seizures, on July 13, 2006, $28,000 was seized from a Mail Boxes Etc. store, apparently being sent by Raychel Cabral to Las Vegas, Nevada.  On October 10, 2006, $105,880 was seized from Nathan Oandasan, a person associated with the Ayala drug organization, at the Honolulu International Airport.  *Id*. ¶¶ 87-90.

On November 16, 2006, CS-5 informed agents that Defendant was sending a package to CS-5 containing crystal methamphetamine.  Agents confirmed the United States Postal Service tracking number, and located the package sent from Las Vegas, Nevada to Honolulu, Hawaii.  A search of the parcel pursuant to a November 17, 2006 search warrant disclosed the presence of approximately six pounds of a substance that field-tested positive for the presence

of methamphetamine.  *Id.* ¶¶ 95-98.

### 4.    *The Necessity Requirement*

According to Agent Wise's affidavit, the DEA investigation had failed to identify all of the co-conspirators and the sites of storage for the narcotics.  *Id.* ¶ 102.  DEA agents either tried or considered several other investigative methods.  The investigative techniques used, according to the affidavit, "have not been able to establish the identities of all those participating in the illegal activity."  *Id.* ¶ 103.  Agent Wise's affidavit discusses the limitations of physical surveillance in relation to the ongoing investigation, and that the tight-knit nature of the communities in which the conspiracy operated limited the ability of the DEA to make additional attempts at physical surveillance.  *Id.* ¶¶ 104-105.  Pen registers, telephone toll records, trap and trace devices, searches, and the use of confidential sources were also used as part of the investigation.  The Wise affidavit explains, in detail, the use and shortcomings of these investigative techniques in relation to the investigation.  *Id.* ¶¶ 107-18,  Finally, the investigators considered and rejected the possibility using grand jury subpoenas or interviews, the execution of additional search warrants, the use of undercover officers, and trash searches.  *Id.* ¶¶ 106, 109-111, 113.

## C.     The First Renewal on Telephone No. 1

Agent Sze's affidavit in support of the thirty-day renewal for a wiretap on Telephone No. 1 states that, "[t]o date, the full objectives of the investigation have not been obtained."  Agent Clement Sze's January 10, 2007 Affidavit in Support of the Application for the First Renewal of the Interception of Wire Communications on Telephone No. 1 ¶ 20.  The affidavit discloses the names of newly determined co-conspirators (based on an analysis of intercepted calls on Telephone No. 1), and describes many of the phone calls intercepted.  *Id*. ¶¶ 21, 26-38.  The affidavit further explains that Agent Sze believes that the continued wiretap "is the only technique that will achieve the objectives of this investigation, which is the dismantlement of the entire Ayala organization."  *Id*. ¶ 54.  The Sze affidavit also sets forth, in detail and in specific relation to the Ayala organization, how normal investigative techniques (electronic and physical surveillance; use of grand jury subpoenas and/or interviews; use of confidential sources; search warrants or consent searches; pen registers, telephone toll records, trap and trace devices; use of undercover officers; and trash searches) have failed, been met with limited success, appear likely to fail, or are too dangerous.  *Id*. ¶¶ 57-72.

### D.   Telephone No. 2

Agent Byrd's affidavit in support of a wiretap on Telephone No. 2

states that, "[t]o date, the full objectives of the investigation [relating to the

investigation concerning Telephone No. 1] have not been attained."  Agent Gary

A. Byrd's January 5, 2007 Affidavit in Support of the Application for an Order

Authorizing the Interception of Wire Communications on Telephone No. 2 ¶ 13.

As a result, the United States sought authorization to wiretap a cellular telephone

used primarily by Raychel Cabral.  The affidavit further describes telephone

conversations between CS-5, Defendant, and Raychel Cabral.  The affidavit

describes three partial payments totaling $28,000 that CS-5 made to Defendant

and Raychel Cabral (at the direction of the DEA) in December, 2006, as

compensation for the six pounds of methamphetamine seized on November 17,

2006.  *Id*. ¶¶ 15-17, 21, 23.  Agent Byrd also recounted four December 22, 2006

conversations between Defendant and Cabral regarding United States currency

being sent from Cabral in Honolulu to Defendant in Las Vegas.  *Id*. ¶ 24.

Agent Byrd's affidavit sets forth in detail the need for the

interception, explaining that to date "[t]he methods of distribution and operation

have not been fully identified.  The identities and roles of accomplices, aiders and

abettors, co-conspirators and participants in their illegal activities have not been

fully determined." *Id*. ¶ 29.  The Byrd affidavit also explains, in detail and in

specific relation to the Ayala organization, how normal investigative techniques

(for example, electronic and physical surveillance; use of grand jury subpoenas

and/or interviews; use of confidential sources; search warrants; pen registers;

telephone toll records; and use of undercover officers) have failed, been met with

limited success, appear likely to fail, or are too dangerous.  *Id*. ¶¶ 29-44.

## E.    Telephone No. 4

At some point after the interceptions began on Telephone No. 2, the

DEA determined that Cabral, with "a history of rapidly discontinuing the use of

telephone facilities," began to use Telephone No. 4.  Agent Gary A. Byrd's

January 25, 2007 Affidavit in Support of the Application for an Order Authorizing

the Interception of Wire Communications on Telephone No. 4 ¶ 32.  Agent Byrd

summarizes various telephone calls involving Telephone No. 4 which appear to

relate to drugs or the movement of United States currency.

Agent Byrd's affidavit again sets forth in detail the need for the

interception, explaining that to date "[t]he methods of distribution and operation

have not been fully identified.  The identities and roles of accomplices, aiders and

abettors, co-conspirators and participants in their illegal activities have not been

fully determined." *Id*. ¶ 31.  Agent Byrd further explains that although some

success was met through the interceptions on Telephone No. 1 and Telephone No.

2, "agents still do not fully know the method of operation utilized by individuals in

this drug organization to facilitate their carefully planned narcotic transactions."

*Id*.  Further, the investigation had not "identified other associates of Raychel

Cabral and Zaneta Nixon, stash houses or locations for the storage of drugs, or

assets accumulated as a result of the sale of drugs."  *Id*. ¶ 32.

The Byrd affidavit also explains, in detail and in specific relation to

the Ayala organization, how normal investigative techniques (for example,

electronic and physical surveillance; use of grand jury subpoenas and/or

interviews; use of confidential sources;[5] search warrants; pen registers; telephone

toll records; and use of undercover officers) have failed, been met with limited

success, appear likely to fail, or are too dangerous.  *Id*. ¶¶ 33-47.

### III.  <u>THE NECESSITY REQUIREMENT</u>

Under Title III of the Omnibus Crime Control and Safe Streets Act of

1968, an application for a wiretap must include "a full and complete statement as

to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

---

[5] Agent Byrd explains that CS-1, CS-2, CS-3 and CS-4 were all "deactivated" by the DEA between June, 2005 and February, 2006.

15

18 U.S.C. § 2518(1)(c).  Additionally, a judge may not authorize a wiretap unless the facts submitted by the applicant show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).  Taken together, these two sections require a full and complete statement establishing "necessity" for the wiretap.[6]  "The purpose of these requirements is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).  These procedural mandates require "strict adherence," with courts applying "utmost scrutiny" to determine if wiretap orders comply with the law.  *Id*.

A reviewing court applies a "common sense approach" using a standard of reasonableness "to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success."  *Id*.

A showing of necessity must go beyond generic limitations that are

---

[6] During the hearing on this matter, counsel for Defendant stated that he was challenging compliance with the requirement of 28 U.S.C. § 2518(3)(c), not § 2518(1)(c).  In other words, he is not claiming that the various applications failed to set forth a full and complete statement as required by law, but instead alleges that the authorizing judge incorrectly determined that the facts as set forth establish necessity.  In any event, a de novo review of the affidavits establish compliance with § 2518(1)(c)'s "full and complete statement" requirement -- the affidavits are both voluminous and detailed.

inherent to traditional investigative methods.  *United States v. Gonzalez, Inc.*, 412

F.3d 1102, 1114-15 (9th Cir. 2005).  To establish necessity "the affidavit must

show with specificity why in *this particular investigation* ordinary means of

investigation will fail."  *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.

1985) (*quoting United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983)).

Nonetheless, although a wiretap should not ordinarily be an initial step in the

investigation, the government "need not exhaust every conceivable alternative

before obtaining a wiretap."  *United States v. McGuire*, 307 F.3d 1192, 1197 (9th

Cir. 2002).

   The Ninth Circuit has also recognized special needs when

investigating conspiracies:

> Conspiracies pose other special dangers.  Unlike individual
> criminal action, which comes to an end upon the capture of the
> criminal, collective criminal action has a life of its own.  Like
> the Hydra of Greek mythology, the conspiracy may survive the
> destruction of its parts unless the conspiracy is completely
> destroyed.  For even if some or many conspirators are
> imprisoned, others may remain at large, free to recruit others
> eager to break the law and to pursue the conspiracy's illegal
> ends.  Reflecting this concern, we have consistently upheld
> findings of necessity where traditional investigative techniques
> lead only to apprehension and prosecution of the main
> conspirators, but not to apprehension and prosecution of . . .
> other satellite conspirators.  Because the government has a duty
> to extirpate conspiracy beyond its duty to prevent the mere
> commission of specific substantive offenses, we conclude that

the government is entitled to more leeway in its investigative
methods when it pursues a conspiracy.

*Id*. at 1197-98 (internal quotations marks and citations omitted); *see also United
States v. DeCoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (finding that the necessity
requirement is evaluated in light of the government's need to "develop an
effective case against those involved in the conspiracy") (*quoting United States v.
Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986); *United States v. Bennett*, 219 F.3d
1117 (9th Cir. 2000).

The Ninth Circuit also recognizes that previous success with the use
of confidential informants "is even less persuasive in the context of an
investigation of criminal conspiracy." *United States v. Canales Gomez*, 358 F.3d
1221, 1226 (9th Cir. 2004).

We have stressed repeatedly that informants as a class,
although indispensable to law enforcement, are oftentimes
untrustworthy. . . .  On occasion, informants mislead
investigators and prosecutors in order to feather their own
nests.  Indeed, juries in federal cases are routinely instructed
that the testimony of witnesses receiving anything from the
government in return for the witness's cooperation must be
examined "with greater caution than that of other witnesses."
There is not a trial lawyer alive who does not understand that
juries are wary of any witness receiving a benefit for testifying.
Here, the government is to be commended for its interest in
wiretap evidence, which, compared to the word of an informant
either in the field or in court, is the gold standard when it
comes to trustworthy evidence.  The truth-seeking function of

18

> our courts is greatly enhanced when the evidence used is not
> tainted by its immediate informant source and has been
> cleansed of the baggage that always comes with them.
> Moreover, wiretap evidence out of the mouths of defendants is
> valuable corroboration of informant testimony.  Such evidence
> serves also to ensure that what investigators are being told by
> informants is accurate, a very valuable function that guards
> against the indictment of the innocent.

*Id*. at 1226-27.

## IV.  <u>STANDARD OF REVIEW</u>

The issuing judge's decision that the wiretap was necessary is factual in nature and is reviewed for abuse of discretion.  *Blackmon*, 273 F.3d at 1207; *Brone*, 792 F.2d at 1506.  Thus, the reviewing court gives deference to the issuing judge's finding that the wiretap was necessary to achieve the goals of the investigation.  The same standard applies to any reviewing court, including a district court.  *See United States v. Stevens*, 800 F. Supp. 892, 905 (D. Haw. 1992); *United States v. Chan*, 2006 WL 1581946, at *5 (N.D. Cal. June 6, 2006).

## V.  <u>ANALYSIS</u>

Defendant argues that the wiretaps were not necessary because traditional investigative techniques were working, as demonstrated by the arrest of some of the co-conspirators prior to the wiretaps.  Although partially true, this argument ultimately fails as it ignores the relation of the wiretaps to the objectives

of the investigation -- to determine the full scope and nature of the conspiracy to distribute drugs, and to gain sufficient admissible evidence to prosecute those involved.

Despite the DEA's pursuit of many traditional techniques, the investigation still had not fully disclosed the conspiracy's scope, the identities of co-conspirators, and sites for the storage of narcotics.  As explained by Agent Byrd in the last (January 25, 2007) of the affidavits, "agents still do not fully know the method of operation utilized by individuals in this drug organization to facilitate their carefully planned narcotic transactions."  Agent Byrd also explained that co-conspirators, stashhouses, and assets had yet to be identified.  Although conventional investigative techniques provided preliminary evidence of parts of the conspiracy, the Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to the apprehension and prosecution of . . . other satellite conspirators."  *McGuire*, 307 F.3d at 1198; *Canales Gomez*, 358 F.3d at 1226.

The affidavits explain in detail, and in specific relation to the Ayala organization, why normal investigative techniques had been tried and had failed or reasonably appeared unlikely to succeed if tried.  As to the confidential sources,

the four affidavits establish that they provided information only after their own arrests, they were not active or inside members of the Ayala organization, they were in an unlikely position to uncover Defendant's source of drugs, and CS-1, CS-2, CS-3, and CS-4 had been "deactivated" for various reasons. In short, the investigation, as demonstrated in all four affidavits, needed more to meet its objective of determining the full scope and nature of the conspiracy.

Further, the four affidavits discussed the limitations of other traditional investigative techniques, again with specific reference to the Ayala investigation. They relate specific instances and practices of the members of the Ayala organization. For example, the January 25, 2007 Byrd Affidavit discusses the limitation of surveillance as to Raychel Cabral and that Defendant used counter-surveillance techniques. With regard to telephone records, Defendant and others used multiple telephones, often listed in various names. Grand jury subpoenas would likely not have been of much use because the people called would likely be co-conspirators and could invoke their Fifth Amendment right against self-incrimination. Trash searches likely would have been of limited value, due in part to the fact that some residences were in buildings with common trash bins and would have been likely to alert members of the conspiracy to the investigation. The placement of undercover agents, according to the affidavits,

had been considered and rejected as too dangerous due to the close-knit nature of the organization, some of whom were family members.

For each of the four wiretaps, Judge Mollway found that "[i]t has been adequately established that normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried." These findings, for each individual Order, is fully supported by the applications and affidavits. The issuing court appropriately exercised its discretion in finding that the necessity requirement had been satisfied.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, this court DENIES Defendant's  Motion to Suppress Wiretap Evidence.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 11, 2007.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States v. Ayala, et al.*, Cr. No. 07-00268-02 JMS, Order Denying Defendant's Motion to Suppress Wiretap Evidence.